SCHWARTZ v. STATE.

(Division A. March 8, 1943.)

[12 So. (2d) 157. No. 35026.]

**J. V. Gipson** and **J. A. Riddell**, both of Meridian, for appellant.

318

Greek **L. Rice**, Attorney-General, by **R. O. Arrington**, Assistant Attorney-General, for appellee.

322

Argued orally by **J. A. Riddell**, for appellant, and by **R. O. Arrington**, for appellee.

**Smith, C. J.**, delivered the opinion of the court.

The appellant was convicted of an assault and battery with intent to kill and murder. One of his complaints is that the evidence is insufficient to support the verdict, because of which the court below either should have granted his request for a directed verdict of not guilty, or, after his conviction, should have set the verdict aside and granted him a new trial.

The evidence for the state discloses that the appellant is secretary of a labor union in Meridian, Mississippi, known as the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators, which is affiliated with the American Federation of Labor. He is an operator of a motion picture machine, and was employed as such by a picture show in Meridian. In January, 1941, Royal and Pruitt began operating a motion picture theater, known as the "Royal." No union labor was employed therein. On being requested by the appellant, in behalf of his union, to employ only union labor in the operation of this motion picture show, Royal and Pruitt declined, whereupon, under the supervision of the appellant, the Royal Theater was picketed for about a month for the purpose of coercing Royal and Pruitt into complying with the labor union's request. The method of this picketing was that several people would parade on the sidewalk in front of the theater, each carrying a sign containing the words "Royal Theater unfair to organized labor." This picketing was continuous, the persons doing the picketing being shifted every few hours. The appellant directed the picketing, taking his turn in participating therein, and when not himself engaged in picketing this theater, spent considerable time each day in a café across the street therefrom looking toward the theater. Another method adopted by the appellant for ascer-

taining whether the picketing had lessened the patronage of the theater was to have one of the employees of this café, or some other person, to buy tickets to the theater, at intervals, during the day with money supplied by the appellant, the tickets being numbered serially, thereby disclosing the number of tickets sold between the first and last serial numbers. The appellant also complained to an agent of the State Tax Commission that Royal and Pruitt were not collecting the sales tax due on the theater tickets that were being sold, and requested him to take some action in the matter.

Shortly after the picketing began, and at intervals for three or four weeks, bombs exploded in the theater, one of these being a "stink" bomb and the others tear-gas bombs. Nobody was injured thereby, but all of the patrons then in the theater were greatly inconvenienced. After this had been going on for about a month, a bomb, designated as a "fire" bomb, exploded in the theater while a picture was being shown therein, seriously injuring several persons, among whom was Mrs. Morton Sansan on whom, the indictment alleges, the assault and battery was committed. This bomb, referred to as a "homemade contraption," was fastened to a leg of one of the chairs in the theater, contained an electric battery, and was timed to explode by means of a watch attached to it. The appellant had sufficient knowledge of electric wiring to make emergency repairs on motion picture machines. Immediately after the explosion of this bomb the appellant was arrested, and the bombing and picketing of the theater ceased.

Three days before the last bomb exploded in the theater, the appellant was engaged in a heated conversation with Mrs. Lucile L. Terry, at a filling station, about the bombing and picketing of this theater, which acts Mrs. Terry seems to have been condemning and the appellant defending. B. L. Thomas joined the group at this time and took part in the conversation. What then occurred can best be told in Mrs. Terry's language: "And it came

up in some way about tear bombs. I just don't remember exactly, but we had been discussing the picketing of that Royal Theatre in quite—well, pretty hotly, Leo and myself. So Mr. Thomas asked Leo (the appellant) if he thought tear bombs would hurt anybody and Leo said 'no,' and he said well, he thought that was a mistake; that the police had said they would, and said his children's eyes had been hurt from it, and their conversation went on. I had asked Leo earlier if he didn't think the union was wrong in not allowing this young man to maybe make a pay-day and then join their union. I also asked him if he had picketed, and he said yes, hadn't I seen him, and I said 'No, I hadn't, and the only person I had seen was that fellow that day, and I was very much surprised to see it done.' So Mr. Thomas got in the conversation, and he went on to talk to Leo, and I did too, about it, and it was discussed generally back and forth about what should not and should be done between all three of us, and about the bombs. Why Mr. Thomas said that the police had said that tear bombs were dangerous, and I believe to the best of my knowledge, Mr. Miller, that Leo contended they were not. And then it came up again about the union, and Leo said they were not going to allow this union after twenty-years—I remember that very emphatically he said twenty years—to be destroyed, what they had gotten up here in Meridian, and that they were going to have to do something drastic about it. Q. Well what drastic did he say it was? What words did he use? A. Well, he said they were going to blow it to h—l,'' all of which was substantially corroborated by Thomas, who stated that the appellant there said, among other things, ''furthermore, if they don't stop it, we are going to blow the d—mn top off the picture.'' All of this was denied by the appellant and another witness who claimed to have heard the conversation.

After the appellant was arrested and placed in jail, he cut his wrist, causing it to bleed so severely that it was necessary for a surgeon to stanch the bleeding. On being

asked by a police officer why he had cut himself, the appellant answered, "I just can't stand the pressure," and upon the officer telling him that "there wasn't any use in trying to kill himself while he was in jail," the appellant made no reply. The appellant, when testifying, said that he broke a milk bottle and cut his wrist therewith for the purpose of forcing his removal from the jail to a hospital, where he would have an opportunity of communicating with his friends. He had not, however, been denied access to his friends by his custodian. While this evidence is entirely circumstantial, it is amply sufficient to warrant the appellant's conviction.

The appellant complains of the admission of the evidence of the explosion of the stink and tear-gas bombs. The ground of his objection thereto is that these explosions evidenced the commission of crimes other than the one for which the appellant was indicted, and were not relevant to the issue which the jury here had to decide, i. e., whether the appellant placed, or was responsible for the placing of, the fire bomb in the theater. All of these stink and tear-gas bombs were evidently placed in the theater in furtherance of the purpose of the appellant and of members of his union to coerce the owners of the theater into employing union labor only therein, or, at least, the jury were warranted in so finding. The conversation of the appellant with Thomas and Mrs. Terry, if believed by the jury, connected the appellant with these explosions; and the conversation disclosed that it was the intention of the appellant and of members of his union, in the event the tear-gas bombs failed to accomplish their purpose, to "blow the d—n top off the picture show—to blow it to h—l." The tear-gas bombs, therefore, together with the appellant's reference thereto in his conversation with Thomas and Mrs. Terry, point to the appellant as the one who placed or was criminally responsible for the placing of, this fire bomb in the theater. No error, therefore, was committed in permitting the introduction of this evidence.

The district attorney asked a witness who was being examined by him as to the personnel of this theater picket line, this question: "Did you see one Percy Higginbottom?" "Was he one of the pickets around there?" On objection being made to this question, the district attorney said to the trial judge, in the presence of the jury, "I am going to show he went and bought a tear gas bomb to put in that theater." An objection to this statement of the district attorney was sustained, and the trial judge had previously charged the jury not to consider any matter to which he should sustain an objection. The appellant says, however, that this was not sufficient, but that his request then made for a mistrial should have been granted. We will not pause to determine whether this statement of the district attorney was subject to the objection made to it; for if it was, the objection thereto having been sustained, no error was committed in refusing the appellant's request for a mistrial. Logsdon v. State, 183 Miss. 168, 183 So. 503.

The Higginbottom referred to was a member of the appellant's union and a participant in the picketing of the theater, and, according to the state's evidence, was seen several times during the picketing period in earnest conversation with the appellant on the sidewalk on the opposite side of the street and directly across from the theater. He went during the picketing period to a drug store in which Freeman was employed, called him off to one side, according to Freeman, and asked him if he knew how to make tear-gas bombs, to which Freeman answered "no." This evidence was admitted over the appellant's objection, and whether competent or not, was harmless. The introduction of the evidence was for the purpose of connecting the appellant and his associates with the placing of the tear-gas bombs in the theater, but that fact appears from the appellant's conversation with Thomas and Mrs. Terry.

In the cross-examination of the appellant, when testifying as a witness, the district attorney exhibited to him

a fifty-dollar bill and said, "I want to ask you if you ever saw this fifty dollars, and did you send this fifty dollars to Mr. Watson to have this fellow Dalton Thomas to leave town and take a vacation before the trial of this case." This question was objected to by counsel for the appellant, but before the court could rule the witness answered it by saying "No, sir." Counsel for the appellant say that notwithstanding this answer of the witness, the question itself was prejudicial to the appellant, being calculated to inflame the minds of the jury against him. They requested the court below not only to instruct the jury to disregard the question, but to enter a mistrial and discharge the jury, both of which the court declined to do. The question itself was unobjectionable, but, of course, should not have been asked unless the district attorney had reason to believe that the incident referred to by him had occurred. The record discloses no further reference to this incident thereafter during the trial.

The jury retired to consider its verdict late on the afternoon of Saturday. During the morning of Monday following, the jury reported to the court that it had failed to reach a verdict, but was directed by the court to return to its room for further consideration of the case. The jury reported again on Tuesday morning that it had been unable to reach a verdict but was again directed by the court to return to its room for the further consideration of the case. Tuesday afternoon the jury again reported that it was unable to reach a verdict, but was again returned to its room for further consideration of the case. The appellant then requested the court to discharge the jury and enter a mistrial, which the court declined to do, stating that each time the jury reported, all of which reports were voluntarily made by it, some of the members thereof thought that the jury might be able to reach a verdict should it further consider the case. At what hour thereafter the verdict of guilty was returned, does not appear.

A jury should be given ample time to consider of its verdict; and how long it should be held together for that purpose is for the decision of the trial judge, which decision will not be disturbed in this court in the absence of the disclosure of such an abuse of this power by the trial judge as indicates that the jury was coerced into returning a verdict. Nothing here so indicates. Had the trial judge told the jury that he would keep it together until it returned a verdict, or had he expressed such an intention out of the presence of the jury, but which was communicated to it, a different question would be presented. The other assignments of error are not of sufficient substance to justify a specific answer thereto.

Affirmed.